**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

     Case No. 6:24-cr-42-JA-LHP

JONEN CASTILLO,

     Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Jonen Castillo, through undersigned counsel, submits this Sentencing Memorandum for the Court's consideration.  Mr. Castillo has pleaded guilty to one count of smuggling goods from the United States (specifically five handguns) through a written plea agreement.  (Doc. 31); 18 U.S.C § 554.  When he was twenty-three years old, Mr. Castillo agreed to mail five handguns to an associate in Canada while the guns were concealed in record players.  Mr. Castillo essentially acted as a mail mule.  He received the record players used to conceal the guns, the money to purchase the guns, and the addresses in Canada to mail the guns—all from elsewhere.  Each gun was intercepted by Canadian border services.  Because Mr. Castillo shipped a total of five handguns, his base offense level starts at 26.  U.S.S.G § 2M5.2(a)(1).  If he had shipped three fewer handguns, Mr. Castillo's base offense level would have started at 14.  U.S.S.G § 2M5.2(a)(2).

Mr. Castillo respectfully asks the Court for a non-prison sentence of five years' probation.  He believes a non-prison sentence is warranted for six reasons:

(1) Mr. Castillo's conduct did not harm the national security or foreign policy interests of the United States, and therefore is not the usual type of conduct covered by U.S.S.G. § 2M5.2; (2) Mr. Castillo was very young at the time of the offense, and the Court should consider that youth under the recently amended U.S.S.G. § 5H1.1; (3) Mr. Castillo lacks any criminal history; (4) Mr. Castillo has substantial vocational skills; (5) Mr. Castillo accepts responsibility for his actions; and (6) Mr. Castillo has the support of his family.  Mr. Castillo humbly suggests that a five-year sentence of probation is sufficient but not greater than necessary to achieve the ends of justice.  18 U.S.C § 3553(a).

## BACKGROUND & PROCEDURAL HISTORY

Mr. Castillo was twenty-three years old at the time of the charged offense. (PSI at 2.)  In 2023, Mr. Castillo and his live-in girlfriend were going through a breakup.  During the course of the breakup, she began to invite her new romantic interests to their shared apartment.  Mr. Castillo became desperate to earn additional money in order to escape his emotionally disorienting living situation.  Due to this desperation, he agreed to mail guns to an associate in Canada by concealing them in record players. (PSI ¶¶ 11.)  Mr. Castillo would receive the record players (paid for by someone else) at his apartment.  He then would receive money (from someone else) to purchase the handguns and mail them in disassembled form to addresses in Canada (which, again, he received from someone else).  Mr. Castillo is charged with shipping five handguns from the United States to Canada in this manner—three in a shipment on June 10, 2023,

2

and two in a shipment on June 29, 2023.  (PSI ¶¶ 12–18.)  All five of the handguns were intercepted by Canadian border services.  (PSI ¶¶ 14, 17.)

On February 14, 2024, Mr. Castillo was indicted on two counts of smuggling goods from the United States—one for each shipment.  (PSI ¶ 1.)  On November 12, 2024, the Government filed a superseding information containing one count of smuggling goods that encompassed both shipments.  (PSI ¶ 2.)  Pursuant to a written plea agreement, Mr. Castillo pleaded guilty to the sole count of the superseding information on November 25, 2024.  (PSI ¶ 5.)

## I.   Mr. Castillo Should Receive a Downward Variance Because His Charges Do Not Reflect The Conduct Typically Proscribed Under U.S.S.G. §2M5.2.

Mr. Castillo's base offense level under the Sentencing Guidelines is governed by U.S.S.G § 2M5.2.  Under Section 2M5.2, the defendant receives a base level of 26 *unless* the offense involves: (a) two or fewer "non-fully automatic small arms;" (b) 500 rounds or fewer of ammunition for "non-fully automatic small arms;" or (c) both.  If the defendant satisfies one of these conditions, Section 2M5.2 provides for a much lower base level of 14.  The Application Notes to Section 2M5.2 clarify that the high base offense level of 26 "assumes that the offense conduct was harmful or had the potential to be ***harmful to a security or foreign policy interest of the United States***."  U.S.S.G § 2M5.2 n.1. (emphasis added).  If no such risk is posed, "a downward departure may be warranted." *Id.*  The Application Notes also direct courts to consider "the degree to which the violation threatened a security or foreign policy interest of the United States, the volume of commerce

involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G § 2M5.2 n.2.

The few reported cases involving Section 2M5.2 make clear that this guideline contemplates extreme conduct posing an obvious threat to national security or foreign policy interests. Examples include cases where defendants:

- worked with Haitian police (an organization known to engage in firefights with the Haitian army) to smuggle disassembled assault rifles into Haiti—a politically unstable country. *United States v. Stines*, 34 F.4th 1315, 1318 (11th Cir. 2022).

- sold 100 AK-47 machine guns to customs agents posing as representatives of Saddam Hussein's regime in the Republic of Iraq. *United States v. Hendron*, 43 F.3d 24, 25 (2d Cir. 1994).

- shipped critical components of sidewinder missiles to Taiwan. *United States v. Tsai*, 954 F.2d 155, 158 (3d Cir. 1992).

- shipped military aircraft parts to the Islamic Republic of Iran. *United States v. Nissen*, 928 F.2d 690, 692 (5th Cir. 1991).

Mr. Castillo's case is entirely distinguishable from those described above, all of which involve exotic weapons, countries hostile to the United States, or countries known for political instability. Mr. Castillo did not send missile components, aircraft parts, or hundreds of assault rifles to terrorist organizations or hostile governments. Mr. Castillo is charged with mailing five handguns to Canada—all five of which were intercepted by Canadian border services. He did this because he needed money to get out of the apartment he shared with his estranged girlfriend. Canada is neither an unstable country nor a threat to

4

American security.  In short, no foreign policy or national security interest was implicated by Mr. Castillo's amateurish and insignificant efforts.

The relatively small number of guns also makes Mr. Castillo's case highly unusual.  If Mr. Castillo had shipped three fewer handguns, he would have qualified for a base offense level of 14 under Section 2M5.2(a)(2).  Instead, Mr. Castillo scores twelve levels higher because he shipped three more guns, the equivalent of *four added levels for every additional gun.*[1]  This ratio is wildly out of sync with the normal firearms guideline.  *Cf.* U.S.S.G. §2K2.1(b) (progressively adding two levels for increasing ranges of firearms).

A particularly instructive case is *United States v. Carter*, 550 F. Supp. 2d 148 (D. Me. 2008), because the defendant in that case, Kurt Carter, received a significant downward variance.  Mr. Carter was charged with conspiracy to export eighteen handguns to Canada.  *Id.* at 148.  At least two of those handguns were recovered in the hands of criminals, including one that was found in possession of someone arrested with a pound of cocaine, and one that was brandished during an altercation at a Canadian nightclub.  *Id.* at 149.  While the court in Mr. Carter's case declined to assign him a lower base level, it recognized "that the circumstances of this crime are hardly indicative of a major international gun running operation," and that Mr. Carter's "sophistication, and the degree of the national interest pale when compared with some other cases."  *Id.* at 151.  The Court further indicated

---

[1] The Government did not give Mr. Castillo—a twenty-four-year-old with no criminal history—the option of pleading to two handguns instead of all five.

5

that it would "take these and other factors into account at the sentencing hearing." *Id.* Kurt Carter ultimately received a sentence of ***31 months*** in a case that involved: (1) over three times the number of guns as Mr. Castillo's case; (2) the same recipient country as Mr. Castillo's case; and (3) firearms being recovered in the hands of criminals and drug dealers. *See* Judgment as to Kurt Carter, United States v. Carter, 1:07-cr-00054-JAW (D. Me. Dec. 16, 2008), ECF 61.

Unlike the *Carter* case, Mr. Castillo's case involved only five handguns which were all intercepted by Canadian border services. So if 31 months is an appropriate sentence for eighteen handguns shipped to Canada in *Carter*, then the ***very most*** Mr. Castillo should receive is 8 months.[2] And that is before considering that all five of the guns Mr. Castillo shipped were intercepted at the border. Given the high level of dissimilarity between Mr. Castillo's case and the normal case governed by Section 2M5.2, Mr. Castillo should receive a non-prison sanction.

## II. The Court Should Heavily Weigh Mr. Castillo's Youth Due To Recent Amendments To U.S.S.G. § 5H1.1.

The Sentencing Guidelines' policy statement concerning age was recently amended on November 1, 2024, to encourage appropriate consideration of a defendant's youthfulness. The amended Section 5H1.1 now reads:

> A downward departure . . . may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance

---

[2] If you take 5 and divide by 18, the result is 0.277. If you multiply 0.277 into 31 months, the result is approximately 8 months. The PSI Report calculates a range of 46-57 months, although Mr. Castillo objects to not receiving a downward adjustment for minor or minimal role.

use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S.S.G. § 5H1.1. The amendment's purpose is to "reflect[] the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability." Amendment 829, U.S. Sentencing Commission, https://www.ussc.gov/guidelines/amendment/829.

The Court should consider that Mr. Castillo was twenty-three at the time of the charged conduct—precisely the "mid-20s range" referenced in Section 5H1.1. Mr. Castillo made an impulsive, out-of-character decision to commit a crime because he was desperate to earn money and move out of the apartment he was sharing with his estranged girlfriend. The Court should consider the role that Mr. Castillo's youth played in his rash decision when deciding its sentence.

## III. Mr. Castillo Has No Criminal History.

"[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis." *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (citation omitted); *United States v. Collington*, 461 F.3d 805, 808–09 (6th Cir. 2006) (reasoning that courts may decide that "criminal history category overstates the severity of the defendant's criminal history or that a lower sentence would still comply with and serve the mandates of section 3553(a)" (citation omitted)). Even

7

where a defendant does not qualify for the zero-point offender variance under U.S.S.G. § 4C1.1, the Court may decide to treat the defendant "even better than if he were a zero-point offender" under 18 U.S.C. § 3553(a). *United States v. Chavez*, 2024 WL 3888704, at *2 (D.S.D. Aug. 21, 2024).

Mr. Castillo lacks criminal history but is ineligible for a two-level downward departure under the zero-point offender guideline because his offense involves firearms. U.S.S.G. § 4C1.1(a)(7). Regardless, the Court should provide Mr. Castillo with at least a two-level downward variance for his lack of criminal history. This variance would be consistent with the Sentencing Guidelines' policy judgment that lack of criminal history implies a lower level of culpability and a lower likelihood of reoffending. *See* U.S.S.G. Chapter 4, Part A, Introductory Comment ("A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. . . . Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.").

## IV. Mr. Castillo's Vocational Skills Make Him A Valuable Member Of Society And Suggest A High Potential For Rehabilitation.

Despite his relative youth, Mr. Castillo has accumulated several vocational skills. These skills make him valuable to his community and improve his potential for rehabilitation. Specifically, Mr. Castillo "has skills in screen printing, photography, fashion, music production, graphic design, video design, and audio engineering." (PSI ¶ 52.) He briefly attended Full Sail University in Winter Park, Florida to study audio engineering before realizing that "school was not for

8

him." (PSI ¶ 51.)  He has been employed at multiple screen-printing companies and has even owned and operated his own fashion brand—Marauder Studios—in the past.  (PSI ¶¶ 52, 54–55.)  He has even provided the Court with pictorial samples of his work (App. C2):






## V.    Mr. Castillo Accepts Responsibility For His Actions.

Mr. Castillo accepts responsibility for committing the charged offense. While the Sentencing Guidelines account for acceptance of responsibility under U.S.S.G § 3E1.1, the Court also may consider it as part of the nature and circumstances of the offense or the history and characteristics of the defendant under 18 U.S.C.§ 3553(a)(1). *See United States v. Lantigua*, 749 F. App'x 875, 883 & n.5 (11th Cir. 2018); *see also United States v. Begley*, 2015 U.S. Dist. LEXIS 59199, at *4 (E.D. Ky. May 6, 2015).

Mr. Castillo's written statement to the Court reflects his deep contrition.  He states that he takes "full responsibility" for the "choices" that he made.  (App. A1.) He further states, "It is really painful knowing I have been throwing away my life with these decisions . . . but I am very, very committed since I have been on bond to turning everything around and just doing the best I can every [] day in changing my image."  (*Id.*)   Mr. Castillo's ultimate goal is to "participate in fashion school." (*Id.*)  He concludes the letter by stating: "Your Honor, I ask for leniency not to escape accountability, but so that I may have the chance to rebuild my life with purpose and meaning. I am determined to learn from this, to make amends, and to move forward as a better, wiser person." (*Id.*)

## VI.    Mr. Castillo Has Substantial Support From Family and Friends.

Mr. Castillo's mother, sister, and former employer have written to the Court to show their support for Mr. Castillo.  The Court should consider each of their statements before imposing its sentence.

Jenklare Castillo, Mr. Castillo's mother, writes that Mr. Castillo grew up in a churchgoing environment; both she and her husband were members of their local church choir.  (App. B1.)  She recounts an incident when a young Mr. Castillo refused to eat leftover food from a religious charity event because he thought "there might be a late comer who would need to eat and did not want to take that share." (*Id.*)  She writes that her son "has an entrepreneurial spirit and love for music even from his younger days dabbling in selling music beats to his friends.  It must be since our family has been involved in church through the choir even before he was born." (*Id.*)  True to Mr. Castillo's entrepreneurial spirit, Ms. Castillo describes how he "organized and put together a weekend pop-up sale event in Miami that involved around 8 other young people who designed and sold their own products like shirts, jackets, jeans all via Instagram." (*Id.*)  Ms. Castillo believes her son has a "good heart" and she is "very grateful that he has been allowed to remain home" with the family on pretrial release.  (*Id.*)

Janh Gaffud, Mr. Castillo's older sister, writes that Mr. Castillo "was raised in an environment filled with music, camaraderie, and church every weekend." (App. B2 at 1.) When Mr. Castillo was in middle school, his sister would often find him "on a laptop, where he was creating beats, lyrics, and songs." (*Id.*) After taking a sewing class in high school, Mr. Castillo developed an interest in fashion.  Ms. Gaffud writes how some of his classmates "would stop by our house to have him taper their jeans." (*Id.*)  Mr. Castillo then began to design his own t-shirts for himself and his friends.  (*Id.*)  Ms. Gaffud writes that her parents and

11

cousins "have even sported some of the looks he put together." (*Id.*) Ms. Gaffud believes that her little brother is an entrepreneur at heart, but because he did not have as structured of a career trajectory as his other siblings, he "began to struggle, especially financially, which affected his decision making at times." (*Id.*) In the eyes of his older sister, Mr. Castillo "is not someone who takes life for granted—he is eager to learn from his mistakes, and always keeps going, and this time is eager to move forward with integrity." (*Id.* at 2.)

Ronny Hantash, Mr. Castillo's former boss at a t-shirt printing company, writes that Mr. Castillo "demonstrated a strong work ethic, dedication, and a positive attitude that made a lasting impact on our workplace." (App. B3.) Mr. Hantash writes that one of Mr. Castillo's "standout qualities was his ability to build strong relationships within [the] creative community. (*Id.*) Mr. Castillo "was recognized by other designers and creatives who brought their projects to Mint Prints, earning their respect through his professionalism, kindness, and willingness to collaborate." (*Id.*)

## CONCLUSION

Mr. Castillo's conduct, while certainly serious, did not harm any national security or foreign policy interest of the United States. A five-year term of probation would be sufficient to achieve the purposes of sentencing under 18 U.S.C. 3553(a) in light of Castillo's age, lack of criminal history, acceptance of responsibility, vocational skills, and strong prospects for rehabilitation due to his familial support. A sentence of five years' probation will appropriately reflect the

nature and circumstances of the offense while allowing Mr. Castillo to remain a contributing member of society. Accordingly, the defense respectfully requests that the Court impose a non-prison sanction of probation.

Dated: March 6, 2025

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq. (FBN 0118748)
Assistant Federal Defender
201 South Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
vitaliy_kats@fd.org

## CERTIFICATE OF SERVICE

I certify that on March 6, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq.

13